NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0421n.06

No. 11-6119

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 26, 2013*
DEBORAH S. HUNT, Clerk

)
)
UNITED STATES OF AMERICA,                    )
                                             )   ON APPEAL FROM THE UNITED
          Plaintiff-Appellee,                )   STATES DISTRICT COURT FOR
                                             )    THE EASTERN DISTRICT OF
     v.                                      )   TENNESSEE
                                             )
CHAD ROYAL,                                  )
                                             )
          Defendant-Appellant.               )

Before:  COLE and DONALD, Circuit Judges; RUSSELL, Senior District Judge.[*]

RUSSELL, Senior District Judge.  Defendant-Appellant Chad Royal appeals his conviction for possession of firearm by a felon.  On November 9, 2010, a federal grand jury indicted Royal and codefendant Jason Kelley for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and possession of a stolen firearm in violation of 18 U.S.C. § 922(j).  Royal moved to suppress the firearm as well as evidence that was seized from his person during a pat-down search, arguing that the officers had neither probable cause nor reasonable suspicion to stop and search either his person or the vehicle where the firearm was found.  The magistrate judge conducted an evidentiary hearing on February 22, 2011, during which all the officers involved in the stop and subsequent investigation testified.  The magistrate judge recommended that the motion to suppress be denied, finding that the initial *Terry* stop and pat-down were appropriate and that upon further

---

[*] The Honorable Thomas B. Russell, United States Senior District Judge for the Western District of Kentucky, sitting by designation.

investigation the officers had probable cause to arrest Royal. Royal objected, and, after conducting a *de novo* review, the district court overruled Royal's objections, adopted the magistrate judge's report and recommendation, and denied Royal's motion to suppress.

Royal pleaded guilty to being a convicted felon in possession of a firearm pursuant to a written plea agreement with the United States. The plea agreement preserved the suppression issue for appeal and permitted Royal to appeal any sentencing issues. The plea agreement also provided for dismissal of the remaining charge, possession of a stolen firearm. In the plea agreement, Royal admitted possessing the firearm and that he had previously been convicted of a felony in Carter County, Tennessee. Royal was advised, pursuant to the plea agreement, of both the Armed Career Criminal Act (ACCA) and non-ACCA statutory ranges.

The presentence investigation report (PSI) prepared prior to Royal's sentencing determined the guideline range to be 180–210 months. Royal objected to the PSI. On September 7, 2011, the district court sentenced Royal to 200 months' imprisonment. This appeal followed.

## I. BACKGROUND

In September 2009, a Rossi .38 caliber revolver and rounds of .38 special ammunition, among other items, were stolen from a clinic in Morristown, Tennessee. After the clinic had been burglarized, but before the burglary was reported, Morristown police officers encountered Royal and Kelley near a car wash. Officer Terry Sexton testified that while on patrol the morning of September 26, at approximately 5:00 a.m., he observed two men near one of the bays of the car wash. Officer Sexton pulled into the car wash and called for backup; Officer David Campbell

arrived less than a minute later. Together, Officers Sexton and Campbell approached the two men, who were later identified as Royal and Kelley.

Officer Sexton had been a patrolman for fourteen years and Officer Campbell for seven. The officers testified they observed Royal and Kelley wearing hooded, long-sleeved, dark-colored clothing with what appeared to be insulation stuck to the outside, and with their hoods pulled over their heads. The officers also noted that neither Royal nor Kelley had a vehicle at the car wash and that both men appeared to be sweating profusely and were visibly nervous. The officers inquired what the men were doing at the car wash and requested identification. Royal and Kelley confirmed they did not have a vehicle at the car wash and told the officers they were just "walking around" but would not specify where they had been. Officer Campbell testified the men might have mentioned something about being dropped off there by a girl and waiting for a ride. Kelley gave the officers his name, but only Royal was able to produce identification. One officer remained with the two men while the other officer checked their names for outstanding warrants; no warrants were found for either Royal or Kelley. These events all transpired within less than four minutes from the time Officer Sexton initially encountered the two men.

The officers testified that they then asked whether Royal and Kelley would consent to a pat-down search for weapons and that both men agreed. During the pat-down search of Royal, Officer Campbell discovered a bag of marijuana, a pocketknife, a screwdriver, and a speed loader for a revolver. Around that time, the officers noticed a maroon Ford Tempo parked several hundred feet away in an otherwise vacant church parking lot just across the street. When the officers asked

whether the car belonged to Royal or Kelley, both men denied any connection to the vehicle. Police later determined the car belonged to Royal's mother.

After the pat-downs, the officers detained Royal and Kelley in the back of a police cruiser until another officer, Corporal Pete Shockley, arrived moments later. Royal and Kelley had not been arrested at that point and were not handcuffed. Corporal Shockley advised Royal and Kelley of their *Miranda* rights and spoke briefly with each man separately. Corporal Shockley noted when he talked to the men that although it was a warm night, both were wearing long-sleeved clothing and sweating profusely.

Corporal Shockley then walked across the street to determine whether the church or any other nearby businesses showed indications of recent criminal activity. At this point, Corporal Shockley noticed the Ford Tempo parked in the otherwise vacant church parking lot. He deemed the vehicle's presence unusual because, based on his experience patrolling the area, church buses were typically the only vehicles parked in that lot overnight.

Captain Dan Cliff arrived shortly thereafter and joined Corporal Shockley. As Captain Cliff and Corporal Shockley approached the vehicle, they observed that the windows were down and the keys were in the ignition. Corporal Shockley testified he observed a number of items in the backseat area, including pieces of mail, a guitar, and a computer printer box. He testified that from the outside of the vehicle he observed a shipping label on the printer box addressed to Dr. Michael Buckridge at a clinic located some four or five miles away. Captain Cliff and Corporal Shockley also testified that from outside the vehicle they observed a piece of mail bearing Royal's name. Other officers were then dispatched to the clinic, where they found indications the clinic had been

forcibly entered. Officers also contacted Dr. Buckridge by phone, who confirmed he was the owner of the printer.

After learning of the apparent burglary at the clinic, officers arrested Royal and Kelley. The Ford Tempo was then towed to the police department and its contents inventoried. Captain Cliff and Corporal Shockley denied that officers searched the vehicle at the scene or opened its trunk. During the inventory search of the vehicle at the police department, officers discovered the Rossi .38 caliber handgun, also stolen from the clinic, which was the basis for Royal's felon-in-possession charge.

Relative to the issue of reasonable suspicion, the United States presented testimony from Officers Sexton and Campbell, Corporal Shockley, and Captain Cliff about their observations and actions on the morning in question. Corporal Shockley and Officers Sexton and Campbell all testified that their suspicions were raised based on Royal and Kelley's dark, long-sleeved clothing with their hoods pulled despite it being a warm night, the fact that both men were sweating heavily, and the officers' observation of what appeared to be bits of insulation on Royal's clothing. Officer Campbell also testified that he and other officers had been told by their supervisors to pay attention to car washes; he noted, however, that there had been no reports concerning the particular car wash where Royal and Kelley were located. At the suppression hearing, Royal introduced his clothing from the morning of his arrest, which was being stored at the detention center, and presented testimony that jail personnel were never instructed to store his clothing in a particular way. Royal's counsel questioned the booking officer as to whether Royal's jacket had anything resembling insulation on it, to which the booking officer testified there was some insulation on the inside.

5

No. 11-6119
*United States of America v. Chad Royal*

After the suppression hearing, the magistrate judge entered a report and recommendation recommending that Royal's motion to suppress be denied. The magistrate judge found the officers' testimony credible and concluded that the initial *Terry* stop and pat-down were proper based on Royal and Kelley's presence at the car wash at 5:00 a.m. on foot with no vehicle in sight and the fact they were wearing dark-colored, "heavy cotton" hoodies with their hoods pulled over their heads on an "extremely warm night." The magistrate judge identified several other facts that he found heightened the officers' suspicion, including (1) that although they claimed to have only been "walking around" (rather than jogging or exercising), both men were sweating profusely, and (2) the presence of what appeared to be building insulation fibers on Royal's clothing. The magistrate judge found, as a factual matter, that Royal consented to the pat-down search but concluded that his consent was unnecessary because the *Terry* frisk was justified. The magistrate judge also found that Royal and Kelley's continued detention was justified after Officer Campbell found "extremely incriminating items" in Royal's pockets, which included a pocketknife, a speed loader, a bag of marijuana, and a screwdriver, noting that "a screwdriver, or something similar, is precisely what a thief would use to break into a coin box at a car wash."[1] (Report & Recommendation at 4, *United States v. Royal*, No. 2:10-cr-130 (E.D. Tenn. Mar. 4, 2011), ECF No. 52 [hereinafter R&R].) In the magistrate judge's view, the discovery of those items, combined with the officers' earlier

---

[1] The magistrate judge also noted: "Contrary to counsels' argument, a speedloader unaccompanied by a revolver is not innocuous or benign; one does not usually carry around a speedloader unless there is a revolver nearby. The marijuana, of course, speaks for itself. And the screwdriver, under the circumstances existing at the time, was not innocent." (R&R at 4.)

observations, served to heighten their suspicion and thereby justified Royal and Kelley's continued detention.

The magistrate judge further found that the items in the Ford Tempo were in plain view and warranted further investigation. Specifically, the magistrate judge made several findings of fact in regard to the vehicle: (1) officers noticed the vehicle almost immediately after encountering Royal and Kelley; (2) both Royal and Kelley specifically denied any connection to the vehicle; (3) the officers who approached the car saw its windows open and keys in the ignition; (4) the items in the backseat area, including printer box, were in plain view; (5) the shipping label on the printer box identified Dr. Buckridge at a clinic a few miles away; (6) Dr. Buckridge confirmed ownership of the printer and that it should still be located at the clinic; (7) the mail bearing Royal's name was in plain view in the backseat; and (8) the firearm was found when the vehicle was inventoried later.

After determining that the length of Royal and Kelley's detention was appropriate, the magistrate judge went on to reject Royal's argument that the officers' observation of the vehicle and its contents should be suppressed as the fruit of a prior illegal detention. The magistrate judge reasoned that because Royal and Kelley had disavowed any connection to the vehicle, the officers were well within their rights to look into the car. Further, because the items in plain view in the vehicle led to further investigation, which in turn revealed that at least one of the items had been stolen, probable cause existed for Royal's arrest.

Royal objected to the magistrate judge's recommendation, arguing there was neither reasonable suspicion nor probable cause to warrant his detention or the pat-down search. Royal also

challenged the veracity of the officers' assertions that certain items were in plain view in the backseat of the car.

On *de novo* review, the district court overruled Royal's objections and adopted the magistrate judge's report and recommendation. The district court identified several factors that it found, taken together, established reasonable suspicion for a brief investigatory detention: (1) Royal and Kelley's presence at a type of business that had recently experienced a number of break-ins, which officers specifically had been instructed to watch while on patrol; (2) the time of day being 5:00 a.m.; (3) Royal and Kelley not having a vehicle at the car wash; (4) that both men were wearing dark, long-sleeved "hoodies" on a warm night (warm enough that the officers were wearing short sleeves); (5) both men were sweating profusely; (6) both men appeared "very nervous"; and (7) the officers' observation that the men had something resembling building insulation on their clothing. The district court also found, as a factual matter, that Royal consented to a pat-down search, during which marijuana, a screwdriver, and a speed loader were found in his pockets. Based on these findings, the court denied Royal's motion to suppress.

Following Royal's guilty plea, the district court conducted a sentencing hearing pursuant to the conditional plea agreement preserving Royal's right to appeal the suppression issue and any sentence imposed. Using the 2010 Sentencing Guidelines, the probation officer classified Royal as an armed career criminal with a corresponding offense level of 30. Royal was assigned 25 criminal history points for a criminal history category of VI, which resulted in a Guidelines range of 168–210 months' imprisonment, restricted by the ACCA's mandatory minimum of 180 months.

Royal challenged his classification as an armed career criminal, arguing that his prior convictions for burglarizing nonhabitations—offenses committed close in time after business hours and without violence—should not count as predicate offenses for purposes of the ACCA. Royal acknowledged, however, that this argument was foreclosed by existing legal authority. The district court accordingly overruled Royal's objections. The district court invited the parties to recommend a particular sentence; Royal asked for the statutory minimum, and the United States, citing Royal's criminal history, recommended a sentence near the top of the Guidelines range. The district court sentenced Royal to 200 months' imprisonment followed by 5 years of supervised release. Royal now appeals.

## II. DISCUSSION

### A. Motion to Suppress

Royal first challenges the district court's denial of his motion to suppress. We review the district court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011). The reasonableness of a seizure is a question of law, and whether an officer had reasonable suspicion to justify a stop presents a mixed legal and factual question, which the Court reviews *de novo*. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). This Court will only disturb a district court's factual findings when, in looking at the entire evidence, it "is left with the firm and definite conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). When a district court has denied a motion to

suppress, we review all evidence in the light most favorable to the government. *Johnson*, 656 F.3d at 377.

### 1. Point of Seizure

An officer may conduct a brief investigatory stop "only if he 'has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). "Reasonable suspicion" must be based on specific, objective facts. *Id.* (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979)). This Court recognizes three types of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)).

Royal essentially argues that his and Kelley's encounter with Officers Sexton and Campbell was an investigative detention from the moment the officers first pulled into the car wash and approached them. Royal bases this argument on two premises: (1) that the officers suspected the men of wrongdoing even before the interaction began, and (2) the officers show of authority, which was followed by a series of questions and running the men's names for warrants. Accordingly, this issue involves two questions: First, at what point was Royal seized within the meaning of the Fourth Amendment? Second, did the officers have reasonable suspicion that Royal had been, was, or was about to be engaged in criminal activity at that point?

An individual is seized within the meaning of the Fourth Amendment when an officer "by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis, internal citations, and quotation marks omitted). Additionally, "an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment." *Johnson*, 620 F.3d at 690 (citing *Brendlin*, 551 U.S. at 254). An officer does not seize an individual "merely by approaching [him] on the street or in other public places and putting questions to [him]," *United States v. Drayton*, 536 U.S. 194, 200 (2002), although this Court has found that "words alone may be enough to make a reasonable person feel that he would not be free to leave," *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). This Court has previously identified several factors as indicative of a seizure: "[T]he threatening presence of several officers, the display of a weapon by the officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (internal quotation marks omitted). Accusing an individual of committing a crime is also a factor indicating that an individual has been seized. *United States v. Williams*, 615 F.3d 657, 664-65 (6th Cir. 2010). However, an officer's subjective intent in detaining an individual is irrelevant unless that intent is conveyed to the individual in such a way as to cause him to believe he is not free to leave. *Campbell*, 486 F.3d at 954.

The district court did not address the question of precisely when the encounter became a seizure for Fourth Amendment purposes; instead, the court simply found that the circumstances were

sufficient to allow police officers to reasonably suspect the defendants of criminal activity and to conduct an investigatory stop. But a careful review of the record and the evidence presented at the suppression hearing suggests that the encounter did not instantly ripen into a seizure at its inception. Officers Sexton and Campbell approached Royal and Kelley and asked to speak to them. The record does not reflect that the officers "engage[d] in any overbearing or coercive activity in making these requests." *See United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999) ("Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, [officers'] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment."). The record merely reflects that the officers approached the two men to inquire what they were doing and where they had been, and to request identification. Royal voluntarily produced identification and Kelley gave his name. The officers did not draw their firearms. The record does not reflect any touching or that the officers made any physical contact prior to the pat-down. The officers do not appear to have used language or asked questions "in a tone indicating that compliance might be compelled." *See Campbell*, 486 F.3d at 954. And, finally, the officers did not accuse either Royal or Kelley of any wrongdoing. *Cf. Williams*, 615 F.3d at 664-65. The fact that the officers testified at the suppression hearing that the two men were not free to leave when the encounter began does not affect this analysis. *See Campbell*, 486 F.3d at 954 (finding that an officer's subjective intent in detaining an individual is irrelevant unless that intent is conveyed to the individual in such a way as to cause him to believe he is not free to leave); *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) ("The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police

conduct only to the extent that intent has been conveyed to the person confronted."). Therefore, at least at its outset, the encounter between the officers and Royal and Kelley seems properly characterized as consensual, for which no level of suspicion is required. *See Waldon*, 206 F.3d at 602; *Avery*, 137 F.3d at 352.

After checking Royal and Kelley's names for warrants, the officers testified that they asked for consent to conduct a pat-down search for weapons. The pat-down search occurred within four minutes from the time Officer Sexton initially encountered the defendants. Upon conducting that pat-down, the officers discovered various items on Royal's person, including a pocketknife, a flashlight, a screwdriver, a bag of marijuana, and a speed loader. Setting the consent issue aside for the moment, at the point in time immediately prior to the pat-down, the officers had by then observed that both men were sweating profusely and noticed what appeared to be building insulation fibers on the outside of their clothing. The officers had also determined that the men did not have a car at the car wash. Further, the officers had been unable to ascertain with any particularity where the two men had been or what they were doing at the car wash on foot at approximately 5:00 a.m.

Officers may consider "the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "The Supreme Court has held that 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'" *Johnson*, 620 F.3d at 694 (quoting *Wardlow*, 528 U.S. at 124). Similarly, the time of day during which the suspicious activity occurs is a relevant, if not dispositive, factor for consideration. *Hoover v. Walsh*, 682 F.3d 481, 494-95 (6th Cir. 2012); *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009); *United States v. Caruthers*, 458 F.3d 459, 467 (6th

Cir. 2006). Further, "the crimes that frequently occur in the area" may be a relevant factor in the reasonable suspicion calculus where those crimes "are specific and related to the reason for which [an individual] was stopped." *Caruthers*, 458 F.3d at 468.

The district court found that the defendants' consent to the pat-down was unnecessary because the officers had reasonable suspicion at that point to conduct a frisk and limited search for weapons that could potentially endanger the officers. A review of the record and relevant precedent suggests the district court's conclusion was correct. At the point in time immediately prior to the pat-down, the totality of the circumstances consisted of the following facts: (1) Royal and Kelley were at a type of business known by police to have had a number of recent break-ins and thefts, and that the officers had been instructed to check while on patrol, *see Caruthers*, 458 F.3d at 468 (frequently occurring crimes in an area may be considered in assessing reasonable suspicion if those crimes "are specific and related to the reason for which [an individual] was stopped"); (2) the time of day was approximately 5:00 a.m., *see Hoover*, 682 F.3d at 494-95 (finding time of day a relevant consideration in assessing reasonable suspicion); *See*, 574 F.3d at 314 (same); *Caruthers*, 458 F.3d at 467 (same); (3) neither Royal nor Kelley had a vehicle at the car wash, *see Wardlow*, 528 U.S. at 124 (finding relevant characteristics of the location may be considered in assessing reasonable suspicion); (4) both men were wearing heavy cotton, dark-colored hoodies with their hoods pulled over their heads on a very warm night, *see Lee v. Hefner*, 136 F. App'x 807, 809-10 (6th Cir. 2005) (affirming the district court's finding of reasonable suspicion where one of the factors cited by the officer was that the suspect was "wearing dark clothing"); (5) Royal and Kelley were visibly nervous, sweating profusely, and had given evasive answers to the officers' questions, *see Wardlow*,

528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *Waldon*, 206 F.3d at 604 (recognizing a defendant's giving of "evasive answers when asked what he was doing in the area" as a factor establishing reasonable suspicion); and (6) the officers observed what appeared to be building insulation on Royal and Kelley's clothes. Therefore, we agree with the district court that the officers had reasonable suspicion, based on articulable facts and the totality of the circumstances, to conduct a brief investigative detention and a limited pat-down search for weapons.

## 2. Consent

Regardless whether the officers had a reasonable articulable suspicion to justify the pat-down, the district court concluded that they asked for, and received, consent to conduct the pat-down frisk for weapons. Royal argues that the officers' "after the fact claim that the defendants somehow consented to the search is not supported by logic and calls into question their veracity as to their assertions as to reasonable suspicion as well." (Appellant's Br. at 34.) However, the district court, via the magistrate judge who conducted the suppression hearing, found Officers Sexton and Campbell's testimony credible, even going so far as to reiterate that determination. (Order at 3, *Royal*, No. 2:10-cr-130 (E.D. Tenn. April 6, 2011), ECF No. 57 (adopting R&R at 6 ("[I]t comes down to an issue regarding the credibility of Sexton and Campbell, and their testimony is believed. . . . To repeat, the officers who testified at the hearing were credible, and they are believed.")).)

Whether a defendant voluntarily consented to be searched is a question of fact, and "the district court's determination regarding consent will not be overturned unless it is clearly erroneous." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999). "This court accords

deference to the district court's assessment of credibility." *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010) (quoting *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)).

Here, Royal points to the General Session Complaint filed by Sergeant Al Herrera, in which Sergeant Herrera characterizes the pat-down as a "search incident to arrest." (Appellant's Br. at 34 (referencing App. at 5).) But the magistrate judge addressed this issue in his report and recommendation, noting that "Sergeant Herrera was subpoenaed to attend the suppression hearing by the defendant Royal, but he was released by [Royal's] attorney Pierce and allowed to leave the courthouse, as a result of which no one, including this court, had the benefit of his testimony." (R&R at 5.) The magistrate judge found Officers Sexton and Campbell's testimony credible and chastised Sergeant Herrera's preparation of those documents as "careless" and "without due consideration of the legal phraseology he employed." (*Id.* at 6.) Royal offers no further justification to question the district court's assessment of credibility. Because Royal's only challenge to the officers' credibility was addressed and disposed of by the magistrate judge, we accord deference to the district court's factual determination on this issue.

### 3. Fruit of the Poisonous Tree

Generally, evidence obtained by an unconstitutional search and seizure is inadmissible regardless of its source. *Williams*, 615 F.3d at 668 (citing *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). The "fruit of the poisonous tree" doctrine supplants this rule by barring evidence that police derivatively obtain from the unconstitutional search or seizure. *See id.*; *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008). But evidence need not necessarily be suppressed "simply because it would not have come to light but for the illegal actions of the police." *Williams*, 615 F.3d at 668

(quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). That is, the fruit of the poisonous tree doctrine will not apply where the connection between the unlawful detention and evidence had become sufficiently attenuated to dissipate the taint. *Id.* (citing *Wong Sun*, 371 U.S. at 491). Whether attenuation is sufficient depends on whether the evidence "has been come by exploitation of [the unlawful seizure] or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 668-69 (quoting *Wong Sun*, 371 U.S. at 488).

In *Brown v. Illinois*, the Supreme Court laid out three factors pertinent to the attenuation inquiry: "[t]he temporal proximity of the [unlawful detention] and the [emergence of the incriminating evidence at issue], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Williams*, 615 F.3d. at 669 (alterations in original) (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Even assuming the underlying search and seizure were unconstitutional, each of these factors, as applied to the facts of this case, weighs in favor of attenuation. The first factor from *Brown*, "temporal proximity," is inapplicable here because, for the reasons discussed above, the detention was not unlawful. In regard to the second *Brown* factor, there were intervening circumstances between Royal's detention and the discovery of the firearm. Finally, based on the magistrate judge and district court's factual findings, the "purpose and flagrancy" factor also weighs in favor of attenuation. Thus, the Court finds no cause for suppression based on the fruit of the poisonous tree doctrine.

## B. Sentencing Under the Armed Career Criminal Act

Royal next challenges his classification as an armed career criminal based on his prior burglary convictions. The ACCA mandates a fifteen-year minimum term of imprisonment for a

defendant convicted of violating 18 U.S.C. § 922(g) if he has three prior convictions for violent felonies committed on occasions different from one another. 18 U.S.C. § 924(e). The ACCA defines "violent felony" as any felony that: "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious risk of physical injury to another." *Id.* § 924(e)(1)(B). Thus, "burglary" is expressly included in the ACCA's definition of "violent felony." For purposes of § 924(e), the Supreme Court defines "generic burglary" as "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor v. United States*, 495 U.S. 575, 599 (1990). Royal concedes that, under *Taylor* and the law of this Circuit, there is no distinction between burglaries of habitations and nonhabitations.

The PSI showed ten prior burglary convictions for Royal. These convictions all qualify as "generic burglaries" under *Taylor* and, thus, "violent felonies," for purposes of § 924(e). Royal concedes that the district court properly sentenced him under the binding precedent of the Supreme Court and this Circuit. He argues, however, that the law should change on two points: First, generic burglaries should not count as violent felonies because prior offenses for burglarizing nonhabitations are not violent in nature; and second, because several of his prior offenses were committed closely in time to one another and were consolidated for plea and sentencing in state court, the law ought not consider these types of offenses as constituting "occasions different" under § 924(e).

Royal's first argument is foreclosed by *Taylor*; therefore, as he concedes, this Court lacks the authority to grant him the relief he seeks. Royal's second argument is similarly foreclosed by

this Circuit's well-established precedent. "[T]hat a defendant was convicted of two offenses during the same judicial proceeding does not prevent those offenses from constituting 'occasions different' under the ACCA." *United States v. McCauley*, 548 F.3d 440, 448 (6th Cir. 2008) (discussing *United States v. Brady*, 988 F.2d 664, 665, 667-68 (6th Cir. 1993) (en banc); *United States v. Roach*, 958 F.2d 679, 683 (6th Cir. 1992)); *see generally Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (reiterating that a published prior panel decision remains controlling authority absent either an *en banc* decision overruling that opinion or an inconsistent decision by the Supreme Court). Royal acknowledges as much, noting his intent to preserve his challenges to the ACCA classification for possible review by the Supreme Court on *certiorari*.

Thus, the district court correctly classified Royal as an armed career criminal for purposes of the ACCA and sentenced him accordingly. Royal seeks a change in an interpretation of the law that may only be provided by the Supreme Court as to his first argument and by either the same or *en banc* review by this Court regarding his second. As such, we will affirm the sentence imposed by the district court.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court to deny Royal's motion to suppress and the sentence imposed.