RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TERESA BENNETT, RICHARD BENNETT, LEWIS
BIRD, PAULA BIRD, BERNARD CAMPAU II,
TAMMY CAMPAU, RANALD CARLSON,
MICHELLE CARLSON, ELIZABETH DALE,
KIMBERLY EBERHART, PATRICK EBERHART,
AMELIA HAEFNER, ROBERT HAEFNER,
ANGELA MORAN, ROB MORAN, JILL
PAKLEDINAZ, ADAM PAKLEDINAZ, KLINT
SIMMEL, TRACY SIMMEL, VINCENT SUGENT,
JAMIE SUGENT, RICHARD WHEATLEY, JOHN
EBY, COOKIE EBY, TRACY GILLIAN, KYLE
GILLIAN, RICHARD HERBERT, MARSHAL
HERBERT, GARY KLAWENDER, STEPHANIE
KLAWENDER, RONALD PYTLAK, NANCY
PYTLAK, RICHARD RODRIGUEZ, DANIEL
RUEHL, MARY RUEHL, DAVID PARKER, and
BARBARA PARKER,

> No. 08-2567

                    *Plaintiffs-Appellants,*

      *v.*

MIS CORPORATION, COACH'S CATASTROPHIC
CLEANING & RESTORATION SERVICES, INC.,
TE/OC, INC., CLAYTON ENVIRONMENTAL
CONSULTANTS, BUREAU VERITAS NORTH
AMERICAN, INC., JACOBS FACILITIES, INC.,
and SAFE TECHNOLOGY, INC.,

                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 07-14005—John Corbett O'Meara, District Judge.

Argued: August 4, 2009

Decided and Filed: June 4, 2010

Before: SILER, MOORE, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Gene S. Davis, FISHER DAVIS PLC, Grosse Pointe, Michigan, for Appellants. Brian H. Phinney, FOLEY, BARON & METZGER, PLLC, Livonia, Michigan, Donald J. Parthum, Jr., PROVIZER & PHILLIPS, PC, Bingham Farms, Michigan, Richard B. Poling, Jr., POLING, McGAW & POLING, P.C., Troy, Michigan, Deborah A. Hebert, COLLINS, EINHORN, FARRELL & ULANOFF, P.C., Southfield, Michigan, Ralph C. Chapa, Jr., KAUFMAN, PAYTON & CHAPA, Farmington Hills, Michigan, Evan A. Burkholder, LeCLAIR RYAN, Dearborn, Michigan, for Appellees. **ON BRIEF:** Gene S. Davis, FISHER DAVIS PLC, Grosse Pointe, Michigan, for Appellants. Brian H. Phinney, FOLEY, BARON & METZGER, PLLC, Livonia, Michigan, Randall E. Phillips, PROVIZER & PHILLIPS, PC, Bingham Farms, Michigan, Richard B. Poling, Jr., POLING, McGAW & POLING, P.C., Troy, Michigan, Deborah A. Hebert, COLLINS, EINHORN, FARRELL & ULANOFF, P.C., Southfield, Michigan, Ralph C. Chapa, Jr., Lawrence C. Atorthy, KAUFMAN, PAYTON & CHAPA, Farmington Hills, Michigan, Evan A. Burkholder, LeCLAIR RYAN, Dearborn, Michigan, for Appellees.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Plaintiffs are air traffic controllers who allege personal injuries based on their exposure to toxic mold at the Detroit Metropolitan Wayne County Airport (DTW). They claim that several mold remediation firms hired by the Federal Aviation Administration (FAA) negligently performed their contracts and exacerbated the building's existing mold contamination. Plaintiffs appeal the district court's order dismissing their complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because we conclude that all defendants but one were properly dismissed, we affirm the district court's judgment in part and reverse in part.

I.

A.

Plaintiffs are FAA employees who work as air traffic controllers in DTW's air traffic control tower ("tower").[1]  In September 2004, the FAA discovered mold in the tower's storage areas and hired MoldQuest International, L.L.C. ("MoldQuest") to investigate.  MoldQuest's testing revealed "significant levels" of mold contamination, including the presence of Stachybotrys, commonly referred to as toxic mold.  MoldQuest's report stated that "the presence of Stachybotrys indicated the affected wall materials had been saturated for an extended period of time."

The FAA hired a private mold remediation firm, defendant MIS Corporation, Inc. ("MIS"), to treat and remove the mold in the tower's fourth and ninth floors.[2]  Plaintiffs allege that MIS's remediation, which took place in January 2005, was "disastrous[,]" causing toxic mold to spread throughout the tower.[3]

The FAA hired defendant TE/OC, Inc. ("TE/OC"), an environmental consulting firm, to evaluate the scope of the cross-contamination and to recommend mitigation strategies.  TE/OC recommended that the FAA retain another mold remediation firm to spray the tower's fourth and ninth floors and its elevator shaft with "approved microbiologic biocide."  The FAA thereafter hired Coach's Catastrophic Cleaning & Restoration Services, Inc. ("Coach") to perform a second remediation.

On January 22, 2005, defendant Coach sprayed the tower's fourth and ninth floors and elevator shaft using "an unmarked container[.]"  "Within hours of the spraying, eight air traffic controllers became ill and sought immediate medical treatment[,]" resulting in a five-hour tower-wide employee evacuation.  According to

---

[1]Plaintiffs also include the air traffic controllers' spouses.  The FAA is not a party.

[2]Mold remediation refers to the removal, cleaning, sanitizing, demolition, or other treatment, including preventive activities, of mold or mold-contaminated matter.

[3]Plaintiffs allege that MIS "failed to follow industry guidelines," "left visible debris on the floors and in the elevator[,]" "failed to seal off the [work] area[,]" and, in general, did not "perform[] [the] [tasks] [] required by the [FAA's] Statement of Work."

plaintiffs, Coach's spray contained "1 Octanol, Undecone, 1-Dodecane, Dodecane, and Tridecane[,]" which can cause "numerous health hazards[,] including . . . lung damage, drowsiness, dizziness, [] pulmonary edema, asphyxiation, . . . vomiting, [] and [] death."

Despite two professional mold remediations, the contamination persisted. The National Air Traffic Controllers Association (plaintiffs' union) hired Wonder Makers Environmental, Inc. ("Wonder Makers") to evaluate the tower's contamination. Wonder Makers detected various strains of mold on the fourth, ninth, and tenth floors, and toxic mold in "air and dust samples" collected "throughout the building."

The FAA again contracted with MIS to perform a third remediation. They also hired Safe Technology, Inc. ("Safe") to recommend an effective mold remediation plan and to provide air-quality testing. In addition, the FAA retained a Certified Industrial Hygienist ("CIH") from Clayton Environmental Consultants ("Clayton") to assist MIS with its remediation efforts.

MIS performed the third mold remediation in May 2005, executing the FAA's specifications according to the consulting reports the FAA received from Clayton and Safe. Plaintiffs assert that Safe's report was flawed because it failed to address several cross-contamination issues. After the third remediation, plaintiffs reported "an increase in the [] severity of [their mold-exposure] symptoms."

In June 2005, the FAA hired defendant Jacobs Facilities, Inc. ("Jacobs") to conduct a site survey and to prepare an assessment report. Jacobs's investigation revealed that the tower's elevator shaft "act[ed] as a piston [that] forc[ed] [contaminated mold-spore] air into each level of the building[.]" The report characterized the tower's overall contamination as "minor," but nonetheless recommended a thorough cleaning of the tower's elevator shaft with a "bleach/water solution."

In May 2006, the FAA hired MIS to perform a fourth remediation, focusing on the tower's elevator shaft. At the direction of the FAA, MIS executed many of Jacobs's recommendations regarding the treatment of mold and other contaminated materials located in the shaft.

Wonder Makers returned in December 2006 to conduct additional testing. Its sampling indicated that the May 2006 remediation failed to "remov[e] all fungal materials." Wonder Makers recommended to the FAA an invasive sampling of the elevator's interior liner to determine if mold spores were present beneath the liner. The FAA ultimately rejected Wonder Makers's recommendation.

In light of plaintiffs' "contin[uing] complaints of health problems," the FAA hired Applied Environmental, Inc.[4] and Safe to investigate whether their multiple remediations had eradicated the mold. In June 2007, Safe recommended that no further mold testing or remediation was required. The FAA adopted Safe's assessment and did not hire MIS to perform a fifth remediation. According to plaintiffs, however, Safe was hired to simply rubber stamp the FAA's decision to cease its mold remediation efforts.

### B.

On September 6, 2007, plaintiffs filed a complaint in the Circuit Court of Wayne County, Michigan, claiming that TE/OC, Safe, Jacobs, and Bureau Veritas North American, Inc., Clayton's successor by merger, were negligent in their consultation and evaluation of the tower's mold contamination and that MIS and Coach negligently executed their mold remediation contracts with the FAA.[5] Plaintiffs sought compensatory and punitive damages in excess of $25,000 resulting from their exposure "to indoor air contamination and ineffective [mold] remediation."

MIS removed plaintiffs' complaint to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1442(a)(1), the federal officer removal statute, asserting that it was acting under the color of federal office by virtue of

---

[4]We granted plaintiffs' motion to dismiss Applied Environmental, Inc. as a party to this appeal on March 4, 2009.

[5]Plaintiffs' complaint also alleged that MIS, TE/OC, Clayton, and Safe engaged in intentional, reckless, and outrageous conduct, but plaintiffs failed to address the district court's dismissal of this claim and have therefore forfeited it on appeal. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (internal citation and quotation marks omitted).

its multiple contracts with the FAA.[6]  MIS argued that it was immune from liability under the government contractor defense because the FAA had closely regulated, monitored, and supervised each mold remediation.  Plaintiffs moved to remand the case, which the district court denied after conducting a jurisdictional hearing.

Relying upon *Fultz v. Union-Commerce Associates*, 683 N.W.2d 587 (Mich. 2004), and its progeny, defendants moved to dismiss the complaint on the grounds that Michigan law does not recognize third-party tort actions for alleged negligent breaches of contract.  Plaintiffs contested the dismissal and moved the district court for leave to file an amended complaint.

After extensive briefing, the district court granted defendants' motions to dismiss and denied plaintiffs' motion to amend their complaint on futility grounds.  Specifically, the district court ruled that the operative complaint and proposed amended complaint failed to allege that defendants owed plaintiffs a duty that was "separate and distinct" from defendants' contractual obligations to the FAA.  *See Fultz,* 683 N.W.2d at 589.

Plaintiffs timely appeal.

## II.

Plaintiffs first claim that the district court lacked subject matter jurisdiction based upon the purported inapplicability of the government contractor defense.  We disagree. The district court's subject matter jurisdiction was not dependant upon the success of the government contractor defense; rather, MIS needed only to assert a "colorable" federal defense at the time of removal.  *Mesa v. California*, 489 U.S. 121, 129 (1989).[7]

The federal officer removal statute permits a defendant to remove to federal court a state-court action brought against the

---

[6] All co-defendants consented to removal.

[7] "[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency[.]"  14C Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Federal Practice & Procedure § 3726 (4th ed. 2009).

United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

In *Willingham v. Morgan*, 395 U.S. 402 (1969), the United States Supreme Court explained the broad scope of the federal officer removal statute:

The federal officer removal statute is not 'narrow' or 'limited.' At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law. One of the primary purposes of the removal statute – as its history clearly demonstrates – *was to have such defenses litigated in the federal courts*. The position of the court below would have the anomalous result of allowing removal only when the officers had a clearly sustainable defense. The suit would be removed only to be dismissed. Congress certainly meant more than this when it chose the words 'under color of office.' In fact, *one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court*. The officer need not win his case before he can have it removed. In cases like this one, Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1).

*Id.* at 406-07 (emphasis added) (citation omitted).

Because MIS is not itself a federal officer, it must satisfy a three-pronged test to entitle it to removal under § 1442(a)(1). First, MIS must establish that it is a "person" within the meaning of the statute who "act[ed] under [a federal] officer[.]" 28 U.S.C. § 1442(a)(1). Second, MIS must demonstrate that it performed the actions for which it is being sued "under color of [federal] office[.]" *Id.* Third, MIS must show that it raised a colorable federal defense. *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); *Lay v. Burley Stabilization Corp.*, 312 F. App'x 752, 759 (6th Cir. 2009) (unpublished) (Moore, J. concurring); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008). We address each of these requirements in turn.

A.

The parties do not dispute that MIS is a person under the statute. Nevertheless, we conclude that the term "person" includes MIS because the "context [of § 1442 (a)(1) does not] indicate[] otherwise."[8] 1 U.S.C. § 1. The plain language of § 1442 does not exclude corporations. In addition, § 1442's text covers "non-natural entities, such as the United States and its agencies, which suggests that interpreting 'person' to include corporations is consistent with the statutory scheme." *Isaacson,* 517 F.3d at 135; *see also Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (same); *Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996) (same); *Pack v. AC & S, Inc.*, 838 F. Supp. 1099, 1102-03 (D. Md. 1993) (same); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992) (same).[9]

The statute permits removal only if MIS was "acting under" an FAA officer. 28 U.S.C. § 1442(a)(1); *see Lay,* 312 F. App'x at 759. In *Watson v. Phillip Morris Companies, Inc.*, 551 U.S. 142 (2007), the Supreme Court held that the Federal Trade Commission's heavy regulation and supervision of a cigarette-manufacturing firm's product-testing did not, standing alone, satisfy the statute's "acting under" requirement:

> The relevant relationship is that of a private person "*acting under*" a federal "officer" or "agency." 28 U.S.C. § 1442(a)(1) (emphasis added). In this context, the word "under" must refer to what has been described as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office." 18 Oxford English Dictionary 948 (2d ed.1989). That relationship typically involves "subjection, guidance, or control." Webster's New International Dictionary 2765 (2d ed.1953). *See also* Funk & Wagnalls New Standard Dictionary of the English Language 2604 (1942) (defining "under" as meaning "[s]ubordinate or subservient to," "[s]ubject to guidance,

---

[8]Specifically, 1 U.S.C. § 1 provides: "In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals[.]"

[9]In *Watson v. Phillip Morris Cos.*, 551 U.S. 142 (2007), the defendant, a cigarette manufacturer, removed a product liability lawsuit under § 1442(a)(1) arguing that it was a "person" who acted under the color of federal office based upon the Federal Trade Commission's detailed regulation of its cigarette testing. *Id.* at 151. The Supreme Court's rejection of Phillip Morris's argument was not based upon its status as a corporation. This outcome suggests, at least implicitly, that a corporate entity falls within § 1442(a)(1)'s definition of a "person." *Id.*

tutorship, or direction of"); 18 Oxford English Dictionary, *supra*, at 949 ("[s]ubject to the instruction, direction, or guidance of"). In addition, precedent and statutory purpose make clear that the private person's "acting under" must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior. *See, e.g.*, *Davis v. South Carolina*, *supra*, at 600, 2 S. Ct. 636; *see also supra*, at 2305 - 2307.

In our view, the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law. We recognize that sometimes an English speaker might say that one who complies with the law "helps" or "assists" governmental law enforcement. Taxpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, for that matter well-behaved federal prisoners, all "help" or "assist" federal law enforcement authorities in some sense of those words. But that is not the sense of "help" or "assist" that can bring a private action within the scope of this statute. That is in part a matter of language. One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as *compliance* with the law (or *acquiescence* to an order), not as "acting under" a federal official who is giving an order or enforcing the law.

*Id.* at 151-52 (emphasis in original).

In rejecting Phillip Morris's argument, the Court distinguished the facts of its case from those of other lower federal court cases that have held that "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153 (citing *Winters*, 149 F.3d at 387). The Court explained that when analyzing whether a private firm is "help[ing]" or "assist[ing]" a federal officer, such that its assistance satisfies the "acting under" requirement:

The answer . . . lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of *Winters* for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover,

at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

*Watson*, 551 U.S. at 153-54.[10]

In its removal motion, MIS claimed that "its work was performed at the direction of, and in accordance with, [] detailed mold abatement specifications established by the FAA" and that "[t]he FAA provided detailed [instructions] . . . pertaining to the materials that MIS was required to use and the manner in which MIS was to perform the [mold] remedial activities." In support of its removal, MIS attached its FAA contracts.[11]

The FAA contracts included precise specifications. For example, during the January 2005 remediation, the FAA mandated that MIS follow explicit parameters for site containment and waste disposal:

> The Contractor must establish a work area perimeter around the area containing the visible mold on the DTW-ATCT fourth and ninth floors. The area where mold is present is to be isolated utilizing a minimum of 6-mil plastic sheeting. Negative pressure is to be supplied to the enclosure with the use of negative air scrubber machines equipped with HEPA (high-efficiency particulate air) filtration.
>
> * * *
>
> The mold contaminated drywall and mold spore-containing waste is to be double bagged in labeled 6-mil polyethylene bags. Each bag shall be adequately sealed. The exterior bag is to be HEPA vacuumed in the equipment room of the Decon chamber prior to exiting to work area. Finally, the bags are transported to and then disposed of in a landfill approved for the disposal of mold and mold-spore containing waste by the State of Michigan.

---

[10] The Court noted that private contracting was not an issue in *Watson*. *Id.* at 154.

[11] When a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes. *Rogers v. Stratton Indus. Inc.*, 798 F.2d 913, 915-16 (6th Cir. 1986). "When facts presented to the district court give rise to a factual controversy, the district court must [] weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist. In reviewing these [] motions, a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir. 1990); *see Ogle v. Church of God*, 153 F. App'x 371, 375 (6th Cir. 2005) (unpublished) (same).

Federal officers closely monitored MIS's work.  Specifically, each contract designated a federal officer who"direct[ly]" supervised each remediation.[12]  These on-site federal officers (hereinafter "FAA contracting officers") were prohibited from modifying or deviating from the FAA's specifications without first obtaining the "signature of the [Lead] Contractor Officer," Judy Ryckman, also an FAA officer. Furthermore, FAA contracting officers had the authority to "require" MIS to "dismiss from work those [MIS] employees which [they] deem[ed] incompetent, insubordinate, unsuitable, or otherwise objectionable."  The FAA also controlled the working hours of MIS employees, who were "escorted by FAA personnel at all times[,]" and were prohibited from entering the work site without prior FAA approval.

Unlike the cigarette manufacturer in *Watson*, MIS's assistance went beyond "simple compliance with the law." *Id.* at 153.  MIS helped FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant – "a job that, in the absence of a contract with [MIS] [or another private mold remediation firm] the [FAA] itself would have had to perform." *Id.* at 154.  Under these facts, we conclude that the contractual "relationship between [MIS] and [the FAA] [was] an unusually close one[,] involving detailed regulation, monitoring, [and] supervision." *Id.* at 153 (citing *Winters*, 149 F.3d at 387).  For these reasons, we conclude that MIS has satisfied § 1442(a)(1)'s "acting under" requirement. *See Watson,* 551 U.S. at 148.

## B.

Next, MIS must show that it performed the actions for which it is being sued "under color of [federal] office." *Acker*, 527 U.S. at 431 (internal citation and quotation marks omitted).  "To satisfy th[is] [] requirement, [MIS] must show a nexus, a 'causal connection' between the charged conduct and [the] asserted official authority." *Id.* (quoting *Willingham,* 395 U.S. at 409).  In other words, the removing party must show that it is being sued because of the acts it performed at the direction of the federal officer.

---

[12]The FAA appointed on-site contracting officers from the Environmental Protection Agency and the Department of Transportation, which operates the FAA.

*See Watson,* 551 U.S. at 148; *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007); *Lay,* 312 F. App'x at 759.  The Supreme Court has indicated that "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137 (citing *Maryland v. Soper*, 270 U.S. 9, 33 (1926) ( "[i]t is enough that [the federal officer's] acts or [] presence at the place in performance of his official duty constitute[s] the basis" for the lawsuit.).

Here, MIS's mold remediation work, which was performed at the direction of FAA officers under contract, was also the alleged cause of plaintiffs' personal injuries. This establishes the nexus required by § 1442(a)(1). *See Willingham,* 395 U.S. at 409. Furthermore, even if plaintiffs were able to demonstrate that the alleged cross-contamination occurred because of an act not contemplated by MIS's contracts with the FAA, it is sufficient for our purposes that MIS's execution of the FAA contracts gave rise to the alleged cross-contamination. *See Isaacson*, 517 F.3d at 138.  "Indeed, whether the challenged act was outside the scope of [MIS's] official duties, or whether it was specifically directed by the [FAA], is one for the federal – not state – courts to answer." *Id.* (citing *Willingham*, 395 U.S. at 409); *see also* 14C Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Federal Practice & Procedure § 3726 (4th ed. 2009).

## C.

Finally, MIS must show that it raised a colorable federal defense. *Acker*, 527 U.S. at 431; *Mesa,* 489 U.S. at 129.  In its removal motion, MIS asserted that it was immune from liability under the government contractor defense as articulated in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988).  In *Boyle*, the Supreme Court held that the "uniquely federal interest[ ]" of "getting the Government's work done" requires that, under certain circumstances, a private contractor must be protected from tort liability associated with its performance of a government procurement contract. *Id.* at 504-05 (internal quotation marks omitted).  The *Boyle* Court thereafter articulated a three-pronged test announcing that

"[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."

*Id.* at 512. Post-*Boyle*, this affirmative defense – the product of federal common law – became known as the government contractor defense. *Id.* at 504.

Plaintiffs assert that the government contractor defense was not a colorable defense because MIS's contracts with the FAA were non-military performance contracts. The availability of the government contractor defense based upon the performance of a non-military service contract presents an issue of first impression in our circuit. However, we have stated that a colorable federal defense need only be plausible, *Upper Cumberland Elec. Membership Corp.*, 484 F.3d at 391; *Lay*, 312 F. App'x at 759, and that a district court is not required to determine its validity at the time of removal. *Upper Cumberland Elec. Membership Corp.*, 484 F.3d at 391 (citing with approval *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("[A colorable federal defense] need only be plausible; its ultimate validity is not to be determined at the time of removal."). For example, in *Acker*, the Supreme Court concluded that the defendant had presented a colorable federal defense of inter-governmental tax immunity even though the Court ultimately rejected that defense. 527 U.S. at 431.

Thus, we must determine whether our lack of precedent regarding the availability of the *Boyle* defense to non-military service contractors defeats the plausibility of the defense. In this regard, "[we] routinely look[] to our sister circuits for guidance when we encounter a legal question that we have not previously passed upon." *United States v. Washington*, 584 F.3d 693, 698 (6th Cir. 2009) (citation and internal quotation marks omitted). As MIS argued in its removal brief, the application of the government contractor defense has found support in the non-military context, as well as in the performance contract context. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1333-34 (11th Cir. 2003) (defense applicable where private service contractor defending a negligent maintenance-contract lawsuit); *Carley v. Wheeled Coach*, 991 F.2d 1117,

1123 (3d Cir. 1993) (defense available to non-military contractors).  *But see In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 810-12 (9th Cir. 1992) (limiting applicability of government contractor defense to military procurement contracts).  In *Hudgens,* the Eleventh Circuit stated that "[a]lthough *Boyle* referred specifically to procurement contracts, the analysis it requires is not designed to promote all-or-nothing rules regarding different classes of contract.  Rather, the question is whether subjecting a contractor to liability under state tort law would create a significant conflict with a unique federal interest."  328 F.3d at 1334 (citing *Glassco v. Miller Equip. Co.*, 966 F.2d 641, 642 (11th Cir. 1992)).

The plausibility of the government contractor defense involving non-military performance contracts has also been accepted by many federal district courts.  *See Guillory v. Ree's Contract Servs., Inc.*, 872 F. Supp. 344, 346 (S.D. Miss. 1994) (holding that federal contractor defense is a colorable federal defense in the non-military performance contract context under 28 U.S.C. § 1442(a)(1)); *see also Richland-Lexington Airport Dist. v. Atlas Props., Inc.,* 854 F. Supp. 400, 421 (D.S.C. 1994) ("[T]here is simply no reason why a nonmilitary contractor should be barred from enjoying this extension of immunity simply because he does not contract with the armed forces."); *Lamb v. Martin Marietta Energy Sys., Inc.*, 835 F. Supp. 959, 966 (W.D. Ky. 1993) ("[T]he Supreme Court's rationale for applying the government contractor defense in *Boyle* is equally applicable in non-military as well as military settings.") (footnote omitted).

Indeed, when the *Boyle* Court articulated its basis for the government contractor defense, it explained that:

> In *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), we rejected an attempt by a landowner to hold a construction contractor liable under state law for the erosion of 95 acres [of land] caused by the contractor's work in constructing dikes for the Government. We said that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.*, at 20-21. *The federal interest justifying this holding surely exists as much*

> *in procurement contracts as in performance contracts; we see no basis*
> *for a distinction.*

*Boyle,* 487 U.S. at 506 (emphasis added) (second alteration in original).  Thus, it is at least plausible that the government contractor defense could apply outside the military procurement contract context because the Supreme Court noted that the origins of the defense, at least in part, were based upon a case that immunized a private contractor from liability arising out of its performance of a public works project. *See Yearsley*, 309 U.S. at 19; *Carley*, 991 F.2d at 1123.  "[T]he [*Boyle*] court concluded that the rationale of the defense is the extension of sovereign immunity, and that in circumstances where the government would not be liable, private actors acting pursuant to government directives should not be liable either."  *Carley*, 991 F.2d at 1123.

Under § 1442(a)(1), MIS was not required to prove the success of the defense. *See Mesa*, 489 U.S. at 133; *Magnin,* 91 F.3d at 1427 (holding that "defense need only be plausible; its ultimate validity is not to be determined at the time of removal"); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) (concluding that "defendant need not prove that he will actually prevail on his federal immunity defense in order to obtain removal"); *Winters*, 149 F.3d at 400-01 (same).

The reason for § 1442(a)(1)'s threshold, colorability requirement is simple:

> [T]he Supreme Court has noted that one of the most important functions
> of this right of removal *is to allow a federal court to determine the*
> *validity* of an asserted official immunity defense.  Removal pursuant to
> § 1442(a)(1) is thus *meant to ensure a federal forum* in any case where
> a federal official is entitled to raise a defense arising out of his official
> duties.  Furthermore, this right is not to be frustrated by a grudgingly
> narrow interpretation of the removal statute.

*Winters*, 149 F.3d at 397-98 (emphasis added) (citation and internal quotation marks omitted); *see Mesa*, 489 U.S. at 133 ("In fact, one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.") (quoting *Willingham*, 395 U.S. at 407) (internal quotation marks omitted); *see also Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 85 (1991)

(expressly acknowledging the difficulty in applying a federal immunity defense: "[T]he question of [] immunity of federal officers" is "complicated[,]," to wit, "[d]etermining whether a federal officer ha[s] acted *ultra vires* [is] fraught with difficulty and subject to considerable manipulation.").

Consequently, because this aspect of plaintiffs' appeal challenges only the basis for MIS's removal under § 1442(a)(1), our focus is not on whether MIS would have succeeded at trial on the *Boyle* defense, but only on whether, for removal purposes, MIS raised a colorable claim to it. In this regard, we have stated previously that "where [a] federal defense [raises] an issue of first impression in this court and [it] ha[s] previously found success in other circuits, one would be hard pressed to say that the defense was not colorable." *Upper Cumberland Elec. Membership Corp.*, 484 F.3d at 391.

For these reasons, we hold that MIS's § 1442(a)(1) removal was proper and that the district court therefore possessed subject matter jurisdiction over plaintiffs' claims.[13]

III.

Plaintiffs also assert that the district court erred in dismissing their complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and improperly denied their motion for leave to amend their complaint on grounds of futility. We review these rulings de novo. *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 443 (6th Cir. 2007); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003). It is well-established that defendants bear the burden of proving that plaintiffs' claims fail as a matter of law. *Devaugh*, 480 F.3d at 443. We must also accept all well-pleaded factual allegations as true and construe the complaint in the light most favorable to plaintiffs. *Id.* We need not, however, accept unwarranted factual inferences. *See Bell Atlantic Corp. v.*

---

[13]"That the federal court ultimately rejects the federal defense that supported removal under § 1442(a)(1) does not mean that it thereby loses subject matter jurisdiction over the removed action; 'the jurisdiction of the federal courts over a properly removed action will not be defeated by later developments in the suit.'" *Jamison,* 14 F.3d at 239 (quoting 14C Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Federal Practice & Procedure § 3739 (4th ed. 2009). In addition, "when removal of a state court action is available because the defendant is a federal officer, the substantive law to be applied is unaffected by the removal. If state law was applicable before the removal, it will apply after the removal." *Id.* at § 3727 (citing *Arizona v. Manypenny*, 451 U.S. 232, 239 (1981)). Here, the parties agree that Michigan law applies to plaintiffs' claims.

*Twombly*, 550 U.S. 544, 570 (2007).  In addition, to survive a motion to dismiss, plaintiffs must aver "enough facts to state a claim to relief that is plausible on its face." *Id.*

A.

Because the district court's rulings are based upon a legal rule that appears unique to Michigan tort law, we discuss the *Fultz* case in detail.  There, the Michigan Supreme Court held that a third party could not sue a party to a contract for its negligent performance of that contract unless the plaintiff alleges that the defendant "owed a duty to [him] that [was] separate and distinct from the defendant's contractual obligations." 683 N.W.2d at 592.

The plaintiff in *Fultz* slipped and fell while walking though a snow and ice-covered parking lot.  683 N.W.2d at 589.  The defendant, Creative Maintenance Limited ("CML"), had previously contracted with the parking lot owner to provide snow removal services.  *Id.*  At the time of plaintiff's fall, CML had neither salted nor plowed the parking lot in approximately fourteen hours.  *Id.*  The plaintiff sued the parking lot owner and CML.  A jury awarded the plaintiff compensatory damages after finding that CML was negligent in its performance of the contract and that its negligence was the proximate cause of plaintiff's injuries.  *Id.*  The Michigan Court of Appeals affirmed.

The Michigan Supreme Court reversed, holding that, as a matter of law, CML "owed no contractual or common-law duty to plaintiff to plow or salt the parking lot." *Id.* at 590.  The *Fultz* court provided the following explanation:

> We believe the "slippery distinction" between misfeasance and nonfeasance of a duty undertaken obscures the proper initial inquiry: Whether a particular defendant owes any duty at all to a particular plaintiff.
>
> This Court and the Court of Appeals have defined a tort action stemming from misfeasance of a contractual obligation as the "violation of a legal duty separate and distinct from the contractual obligation."
>
> We believe that the "separate and distinct" definition of misfeasance offers better guidance in determining whether a negligence action based

on a contract and brought by a third party to that contract may lie because it focuses on the threshold question of duty in a negligence claim. As there can be no breach of a nonexistent duty, the former misfeasance/nonfeasance inquiry in a negligence case is defective because it improperly focuses on whether a duty was breached instead of whether a duty exists at all.

Accordingly, the lower courts should analyze tort actions based on a contract and brought by a plaintiff who is not a party to that contract by using a "separate and distinct" mode of analysis. Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie.

*Fultz*, 683 N.W.2d at 592 (citations and footnote omitted). The Michigan Supreme Court decided the *Fultz* case in 2004. Since then, the *Fultz* holding often functions to bar a third-party plaintiff from suing a contractor for its negligent performance.

The best illustration of the rule's scope is set forth in *Banaszak v. Northwest Airlines, Inc.*, No. 263305, 2006 WL 473848, at *1 (Mich. Ct. App. Feb. 28, 2006) (unpublished).[14] There, the Michigan Court of Appeals reversed a trial court's grant of summary disposition in favor of an elevator contractor that was sued for negligence arising out of its installation of a moving walkway at the DTW. *Id.* The plaintiff in *Banaszak* fell into a four-foot deep "wellway" that defendant Otis Elevator Company had inadequately covered with plywood.[15] *Id.* at *3. According to Otis's contract with Northwest Airlines, Otis was required to secure open wellways with aluminum covers. *Id.* at *3-5. On appeal, the plaintiff argued that *Fultz* did not bar her recovery against Otis because it had created a "new hazard," i.e., the use of plywood instead of aluminum to cover the wellway, which created a duty that was separate and distinct from Otis's contractual obligations to Northwest. *Id.* at *5. The Michigan Court of Appeals agreed:

---

[14] Pursuant to Michigan Court Rule 7.215(C)(1): "An unpublished opinion [of the Michigan Court of Appeals] is not precedentially binding under the rule of stare decisis." *See People v. Green*, 680 N.W.2d 477, 484 n.5 (Mich. Ct. App. 2004).

[15] A wellway is an opening at the end of the moving walkway that contains the mechanical elements. *Banaszak v. Northwest Airlines, Inc.*, 722 N.W.2d 433, 434 (Mich. 2006).

> Whether others removed structural plywood covers, or whether others placed the deficient plywood are factual matters to be determined at trial. Whether the action presents one of failure of policing by others, the general contractor, or the owner as a theory of defense is also subject to proof at trial. Otis Elevator's performance, and choices of performance, are negligence issues and not duty issues. And these, like the theories concerning proximate causation are questions of fact for the jury.
>
> Because Otis Elevator owed a separate and distinct duty from that required under its contract with Northwest Airlines, the trial court erred in granting summary disposition in favor of Otis Elevator and dismissing plaintiff's claim. We reverse and remand for further proceedings consistent with this opinion.

*Banaszak*, 2006 WL 473848, at \*5 (citation omitted).

In a one-paragraph order, the Michigan Supreme Court reversed the appellate court's decision and reinstated the trial court's order granting Otis's motion for summary judgment:

> On order of the Court, the application for leave to appeal the February 28, 2006 judgment of the Court of Appeals is considered and, pursuant to MCR 7.302(G)(1), in lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals and REINSTATE the order of the Wayne Circuit Court granting summary disposition to defendant Otis Elevator Company. Otis entered into a contract to install moving walkways in a new airport terminal. As part of that contract, Otis was required to provide a cover over the "wellway," an opening at the end of the moving walkway that contains the mechanical elements. The purpose of the cover was to protect persons using that area. The plaintiff was injured when she stepped on an inadequate piece of plywood covering the "wellway." *This hazard was the subject of the Otis contract*. As a result, Otis owed no duty to plaintiff that was "separate and distinct" from its duties under the contract. *Fultz v. Union-Commerce Associates*, 470 Mich. 460, 683 N.W.2d 587 (2004).

*Banaszak v. Northwest Airlines, Inc.,* 722 N.W.2d 433, 434 (Mich. 2006) (emphasis added).

Plaintiffs argue that the Michigan Supreme Court's order in *Banaszak* is not controlling due to its brevity and because orders of the Michigan Supreme Court are not precedentially binding. We disagree. "Because the Supreme Court's order can be []

understood, it is binding precedent." *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364, 370 (Mich. Ct. App. 2002); *see Brooks v. Engine Power Components, Inc.*, 613 N.W.2d 733, 735 (2000), *overruled on other grounds*, *Kurtz v. Faygo Beverages, Inc.*, 644 N.W. 2d 710, 714 (Mich. 2002); *People v. Phillips*, 575 N.W.2d 784, 789 n.11 (Mich. Ct. App. 1997) (citing *People v. Crall*, 510 N.W.2d 182, 183 n.8 (Mich. 1993)); *Carrington v. Cadillac Asphalt, LLC*, No. 289075, 2010 WL 446096, at *1 (Mich. Ct. App. Feb. 9, 2010) (unpublished per curium opinion) (Michigan courts are bound by *Banaszak* order).

Under the Michigan Supreme Court's holding in *Banaszak,* Michigan and federal district courts sitting in diversity have concluded that there is no independent duty under *Fultz* when a plaintiff alleges a hazard that is the subject of the defendant's contractual obligations. *See Mierzejewski v. Torre & Bruglio, Inc.*, 729 N.W.2d 225 (Mich. 2007) (no new hazard despite hazardously displaced snow because snow removal subject of parties' contract); *Thacker v. Encompass Ins.*, No. 265405, 2006 WL 1451554, at *5 (Mich Ct. App. May 25, 2006) (unpublished per curium opinion) (no new hazard despite cross-contamination caused by negligent mold remediation because mold removal subject of parties' contract); *Crespo v. Henkel Corp.*, No. 1:06-CV-325, 2007 WL 2284257, at *3 (W.D. Mich. Aug. 7, 2007) (no new hazard because alleged toxins released by metal working fluids was subject of parties' contract), *aff'd*, 339 F. App'x 514 (6th Cir. 2009) (per curium); *Irrer v. Milacron, Inc.*, No. 04-72898, 2007 WL 677902, at *1 (E.D. Mich. Mar. 6, 2007) (no new hazard where metal working fluid toxins permeated plant injuring employees because metal working fluid maintenance subject of parties' contract).

In short, under Michigan law, when an obligor contracts with an obligee to perform services, the obligor does not necessarily assume the obligee's legal duties. Using the *Fultz* case as an example, when CML contracted to remove snow and ice by salting and sanding the owner's lot, it did not assume the owner's duty to provide a reasonably safe premises. Thus, by implication, the injured plaintiff's negligence action would lie against the premises owner and not the contractor. In turn, the premises owner may seek indemnification or contribution from the contractor.

In this regard, most jurisdictions deem a negligent action by a contractor to be a voluntary assumption of a duty to foreseeable plaintiffs. *See Briere v. Lathrop Co.*, 258 N.E.2d 597, 602 (Ohio 1970) (holding general contractor liable for painter's injury where employee of general contractor assisted subcontractor's employee in moving scaffold, thereby proximately causing painter's fall from scaffold); *Trail-Likoy v. Saint Joseph Healthcare, Inc.*, No. 2005-CA-000658-MR, 2006 WL 2193496, at *2-3 (Ky. Ct. App. 2006) (expressly recognizing viable cause of action for negligence against hospital's cleaning contractor who placed rumpled mat in hospital vestibule, although noting that plaintiff's injury, a severed thumb, was not the foreseeable consequence of any negligence by cleaner because injury was caused when plaintiff placed thumb in hinge of automatic door while attempting to straighten rumpled mat with foot); *Burks v. Kroger Co.*, No. M2008-02664-COA-R3-CV, 2009 WL 4059145, *6-9 (Tenn. Ct. App. Nov. 23, 2009) (reversing trial court's grant of summary judgment to roofing contractors because there existed a genuine issue of material fact concerning whether roofing contractors' negligent repair of grocery store's leaking roof proximately caused plaintiff's injuries).

Thus, except in Michigan, the nonfeasance/misfeasance dichotomy is recognized because a contractor who fails to act assumes no duty to third persons by his inaction, while a contractor who negligently acts, assumes, under the law, a duty to foreseeable persons who may be injured by the contractor's conduct. *Id.*; *see Morgan v. Scott*, 291 S.W.3d 622, 632 (Ky. 2009); *Biscan v. Brown*, 160 S.W.3d 462, 483 (Tenn. 2005); *Wissel v. Ohio High School Athletic Ass'n,* 605 N.E.2d 458, 465 (Ohio Ct. App. 1992); *see also* Dan B. Dobbs, et al., Prosser and Keeton on Torts, § 56, Acts and Omissions, 373-85 (5th ed., 10th reprint, 2004). As then Chief Judge Benjamin Cardozo of New York's Court of Appeals explained, "[t]he query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good." *H.R. Moch Co. v. Rensselaer Water Co.*, 159 N.E. 896, 898 (N.Y. 1928).

However, this well-accepted principle of tort law is no longer the law in Michigan. *See Fultz*, 683 N.W.2d at 592. *But see Davis v. Venture One Constr., Inc.*, 568 F.3d 570, 574-76 (6th Cir. 2009) (discussing the *Fultz* case and holding that under Michigan law "[c]ontractual duties do not limit separately existing common law tort duties"). Since we decided *Davis,* however, the Michigan Court of Appeals has held that, while "eloquent[]," the *Davis* decision is not consistent with *Fultz*, *Mierzejewski*, *Banaszak,* or its progeny. *Carrington*, 2010 WL 446096, at *1 ("[O]ur Supreme Court has made clear that [the distinction recognized in *Davis*] [is] not allowed under the majority's interpretation of *Fultz* when determining what constitutes a 'separate and distinct' duty.").

It is a well-established rule in this Circuit that a panel of this court may not overrule a prior published opinion of our court absent en banc review or an intervening and binding change in the state of the law. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985); *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009). A caveat to this rule was first explored in *Blaine Construction Corp. v. Insurance Company of North America*, 171 F.3d 343, 350 (6th Cir. 1999), a diversity case applying Tennessee law. In *Blaine*, the panel declined to reconsider a dispositive Sixth Circuit case interpreting state law on the theory that it was bound by a prior panel decision. The panel further indicated, however, that it would have been empowered to revisit the prior case had there been "an indication by the Tennessee courts that they would have decided [the previous Sixth Circuit case] differently." *Id.* at 350; *see also Rutherford*, 575 F.3d at 619. In *Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1999), a panel of this court interpreted *Blaine* as standing for the proposition that a "panel may reconsider [a previous panel decision interpreting state law when] the [state] courts have expressly indicated . . . that they disagree with [the previous panel decision] and would have decided it differently."

Here, the Michigan Court of Appeals in its *Carrington* decision "expressly indicate[s]," *Hampton*, 191 F.3d at 701, that *Davis* is incorrect in light of *Mierzejewski* and *Banaszak. See Carrington*, 2010 WL 446096, at *1 n.1. The fact that *Carrington*

is a Michigan Court of Appeals opinion, as opposed to a Michigan Supreme Court decision, is not dispositive because "[w]e will accept the holding of a state intermediate appellate court with respect to state law unless we determine the highest court of the state would decide otherwise." *United States v. Philp*, 460 F.3d 729, 732 (6th Cir. 2006); *see also Hampton*, 191 F.3d at 702 (indicating that the Circuit "should presume the Michigan Supreme Court would agree [with the Michigan Court of Appeals] unless it[']s clear the Michigan Supreme Court would likely disagree").

We acknowledge that *Carrington* is an unpublished decision. Pursuant to Michigan Court Rule 7.215(C)(1), "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis," and, as a result, we are not necessarily bound by *Carrington*'s holding. *See Am. Fidelity & Cas. Co. v. Indem. Ins. Co. of N. Am.*, 308 F.2d 697, 700 (6th Cir. 1962) ("[I]t would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court."). However, despite the fact that *Carrington* is not precedentially binding, it remains our overarching duty to ensure that we correctly apply Michigan law. After doing so, we conclude that it would be improper for us to disregard *Carrington*'s analysis of *Davis* and adhere to *Davis* merely because *Carrington* is unpublished. *Carrington* provides persuasive evidence that the Michigan courts would have decided *Davis* differently, and we should accord *Carrington* deference notwithstanding the fact that it is not technically binding. *Cf. Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985) (noting that in determining state law the panel is entitled to look to the "relevant *dicta* in related [state] cases" (emphasis added)).

In light of the Michigan Supreme Court's decisions in *Mierzejewski* and *Banaszak*, we conclude that it is very unlikely that the Michigan Supreme Court would disagree with *Carrington*'s pronouncement that the *Davis* panel's reasoning runs contrary to Michigan law. Because *Carrington* provides us with a clear indication that *Davis* would have been decided differently in the Michigan courts, there is sufficient evidence to allow this panel to disregard our decision in *Davis*. *See Hampton*, 191 F.3d at 701; *cf. Rutherford*, 575 F.3d at 619.

B.

In the present case, defendants fall into two performance categories: consultation or removal.  According to plaintiffs' complaint, defendants TE/OC, Safe, Jacobs, and Bureau Veritas provided professional consultation services to the FAA by producing reports that recommended mold remediation strategies.  Defendants MIS and Coach, on the other hand, performed the actual mold remediation work at the direction of the FAA.  The *Fultz* case applies to plaintiffs' negligence claims because they were not parties to defendants' contracts and they do not assert that they were third-party beneficiaries.  Thus, the salient inquiry is whether plaintiffs' complaint avers that any defendant created a "new hazard" that gave rise to a duty that was "separate and distinct" from its contractual obligations to the FAA.  *See Fultz,* 683 N.W.2d at 587.

Plaintiffs rely heavily on *Conant v. State Farm & Cas. Co.*, No. 260524, 2006 WL 1411216, at *1 (Mich. Ct. App. May 23, 2006) (unpublished per curium opinion), for the proposition that a mold remediation contractor can be held liable to a third party if its negligent work-site containment procedures cause the spread of dangerous mold.  *Id.*  In *Conant*, plaintiffs' homeowner insurer instructed a mold removal contractor to cut holes in plaintiffs' bedroom wall to discover the source of their claimed water damage.  *Id.*  Despite evidence of mold in the wall's interior, the contractor did not seal off his work area.  *Id.*  The plaintiffs claimed that by cutting the holes, the contractor dislodged dormant mold spores that, until then, had been contained, and upon disruption, had become hazardously airborne.  *Id.*  The jury returned a verdict for the plaintiffs, finding the insurer and mold contractor negligent.  The Michigan Court of Appeals affirmed.  *Id.*  However, contrary to plaintiffs' position, *Conant* is inapposite because the mold removal contractor was not a party to the plaintiffs' appeal – thus, the Michigan Court of Appeals was not resolving a *Fultz* rule question.  In addition, the plaintiffs in *Conant* were not a third party with regard to their homeowner insurer.

Instead, as defendants argue, *Thacker v. Encompass Ins. Co.*, No. 265405, 2006 WL 1451554 (Mich App. Ct. May 25, 2006) (unpublished per curium opinion) is more persuasive.  There, a plaintiff claimed, *inter alia*, that Soil & Materials Engineers, Inc.

("SME"), a mold remediation company hired by her homeowner insurer to remove existing mold contamination "failed to remedy and/or worsened the dangerous [mold] conditions[,]" which caused her personal injuries. *Id.* at *1 (quotation marks omitted). It was uncontested on appeal that the plaintiff was a third party to the mold remediation contract:

> Finally, plaintiff argues that genuine issues of material fact exist regarding whether SME and Colby breached their common-law duties, as described in Restatement Torts, 2d, § 324A, to perform their contractual undertakings with ordinary care. We disagree. Plaintiff's claims against SME were dismissed by the trial court on the ground that, contrary to the *Fultz* holding, plaintiff failed to establish that SME owed a duty to her that was separate and distinct from its contractual obligations. On appeal, plaintiff has failed to distinguish the *Fultz* holding or establish SME's independent duty. Accordingly, we conclude that her claims against SME were properly dismissed.

*Id.* at *5. We find the *Thacker* case instructive regarding what constitutes a "new hazard" under Michigan law with respect to a mold remediation contract.

1.

We hold that pursuant to *Thacker*, *Banaszak*, and *Mierzejewski*, the *Fultz* rule of law forecloses plaintiffs' claims against the consulting defendants, TE/OC, Safe, Jacobs, and Bureau Veritas. Specifically, the FAA hired TE/OC to conduct air quality testing, to provide a mold remediation strategy, and to assess the extent of the tower's existing contamination. The FAA hired Safe to produce indoor air quality reports, mold-sampling recommendations, and mold removal strategies. The FAA's contract with Jacobs involved its consultation regarding the mold contamination in the tower's elevator shaft and its preparation of a moisture assessment report. The FAA hired Clayton/Bureau Veritas to address the contamination in the tower's elevator shaft and to retain a CIH.

Plaintiffs' claims against each of these defendants simply allege that they negligently performed their FAA contracts. In essence, their failure to perform did not create a "new hazard"; they merely left alone an existing mold hazard, or allowed

contemplated mold hazards to manifest themselves. *See Banaszak,* 722 N.W.2d at 434 (no duty to plaintiff when she stepped on an inadequate piece of plywood covering a wellway because proper wellway covering subject of contract); *Mierzejewski*, 729 N.W.2d at 225 (no new hazard despite hazardously displaced snow because snow removal subject of contract); *Thacker,* 2006 WL 1451554, at *5 (no new hazard because mold remediation was subject of contract); *Crespo,* 2009 WL 2018001, at *3 (no new hazard because metal working fluid maintenance subject of contract); and *Irrer,* 2007 WL 677902, at *1 (no new hazard where metal working fluid toxins permeated plant because metal working fluid  maintenance was subject of contract).  Accordingly, we conclude that the district court did not err in ruling that plaintiffs' complaint failed to assert a duty that was "separate and distinct" from TE/OC's, Safe's, Jacobs's, and Bureau Veritas's contractual obligations under their FAA contracts.  Put another way, under *Fultz*, these defendants did not assume the FAA's duty to provide a reasonably safe working environment when the FAA hired them to provide consulting services.

2.

Next, we must analyze whether plaintiffs' complaint avers that MIS or Coach created a new hazard that gave rise to a duty that was separate and distinct from their contracted-for duties.  Plaintiffs argue that MIS's negligent work-site containment and mold disposal procedures created a new hazard, namely, severe cross-contamination.[16] However, pursuant to *Fultz, Banaszak, Mierzejewski*, and *Thacker*, MIS's failure to properly contain its work area and dispose of contaminated mold debris did not give rise to a concomitant duty to plaintiffs because mold containment and disposal procedures were the subject of its FAA contracts. *See also Crespo,* 2009 WL 2018001, at *3; *Irrer,* 2007 WL 677902, at *1.  Moreover, cross-contamination was a contemplated hazard in its FAA contracts.  Thus, any cross-contamination that resulted from MIS's negligent performance did not constitute a new hazard as that concept is understood and applied under Michigan law.

---

[16]As previously discussed, the FAA's statement of work provided specific instructions regarding site containment and waste disposal.

The FAA's contract with Coach presents a more difficult question. According to the operative complaint, the FAA directed Coach to spray the fourth and ninth floors and elevator shaft with an "*approved* microbiologic biocide." (Emphasis added.) Coach argues that it did not create a new hazard under *Fultz* because "the FAA had full knowledge of what [biocide it would use] and where it was going to be applied."

However, plaintiffs' complaint avers that Coach used "an unmarked container" to spray "1 Octanol, Undecone, 1-Dodecane, Dodecane, and Tridecane," allegedly dangerous chemicals, which can cause "numerous health hazards, including . . . lung damage, drowsiness, dizziness, pulmonary edema, asphyxiation, . . . vomiting, and [] death." When Coach sprayed the "unmarked" substance, it caused a five-hour tower-wide employee evacuation and sent several plaintiffs to the hospital. The hazard of exposure to toxic biocide was not the subject of the FAA's contract with Coach. Thus, plaintiffs' claim against Coach is distinguishable from *Crespo* because the alleged hazard is not an exposure to toxic mold, but an exposure to toxic biocide. *See generally*, *Katzman v. Orion Constr. Co.*, No. 268006, 2006 WL 2382429, at *3-4 (Mich. Ct. App. Aug. 17, 2006) (unpublished per curium opinion) (ruling that contractor owed plaintiff a duty that was separate and distinct from its snow removal duties because it left behind an unusually large piece of rock salt that was concealed under two inches of snow, causing plaintiff to trip and injure herself. Court ruled that rock salt hazard was a new hazard because alleged hazard did not involve a pre-existing snow hazard, but the introduction of a latent and unusual piece of rock salt).

Viewing the facts in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, the toxic biocide sprayed by Coach was not an "*approved* microbiologic biocide" and, thus, was not the subject of its contract with the FAA. (emphasis added); *see Banaszak,* 722 N.W.2d at 434; *Devaugh*, 480 F.3d at 443. Moreover, exposure to toxic biocide was not a contemplated hazard in Coach's contract with the FAA.

For these reasons, we hold that Coach's use of this allegedly unapproved biocide gave rise to a duty under Michigan law to foreseeable persons, such as these plaintiffs,

that was "separate and distinct" from its contract with the FAA. Therefore, we conclude that under the *Fultz* rule of law, the district court erred by dismissing Coach from this action. *See Reed v. Shurlow*, Nos. 288201-02, 2009 WL 4827827, at *4 (Mich. Ct. App. Dec. 15, 2009) (acknowledging that post-*Fultz*, "the law [continues to] provide, in certain circumstances, for third party liability arising from negligent performance of contractual duties").

3.

Plaintiffs also argue that a "special relationship" existed between plaintiffs and defendants under Michigan law that created a duty that was separate and distinct from defendants' contractual duties. Specifically, plaintiffs argue that defendants' expertise in the area of mold remediation created a duty owed to plaintiffs as occupants of the DTW building.

Negligence law typically does not impose an affirmative duty to act for the protection of another; however, Michigan law recognizes a number of special relationships that impose such affirmative duties. *Stiver v. Parker,* 975 F.2d 261, 270-71 (6th Cir. 1992). Some "special relationships recognized [in] Michigan [] are . . . innkeeper to guest, employer to employees, psychiatrist to patient, doctor to patient outside medical malpractice liability[.]" *Id.* (citation omitted); *see also Dawe v. Dr. Reuven Bar-Levav & Assocs., P.C.*, 780 N.W.2d 272, 275 n.3 (Mich. 2010) (noting that Michigan "has determined that a 'special relationship' exists in a variety of situations," and "has classified the common carrier-passenger, innkeeper-guest, landlord-tenant, employer-employee, and doctor-patient relationships as special relationships").

"The duty owed in a special relationship is often based on a two party relationship under which one delivers a service and the other pays for the service[.]" *Id.* at 271 n.17. "In analyzing special relationships and deciding whether one person has a duty to aid or protect another, courts also look to whether the defendant created any hazard which did not already exist, or increased existing hazards by either taking or not taking certain steps." *Id.* (citation and internal quotation marks omitted). As the Michigan Supreme Court recently reiterated, "[t]he rationale behind imposing a duty to

protect in these special relationships is based on control." *Dawe*, 780 N.W.2d at 275 (internal quotation marks omitted). In each instance where the Michigan courts have recognized a special relationship "one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Id.* (internal quotation marks omitted). "The duty to protect is imposed upon the person in control because he is best able to provide a place of safety." *Id.* (internal quotation marks omitted). Thus, under Michigan law, "a special relationship would exist if the plaintiff[s] had entrusted [them]sel[ves] to the protection and control of [the] defendant[s] . . . and, in so doing, lost the ability to protect [them]sel[ves]." *Murdock v. Higgins*, 559 N.W.2d 639, 643 (Mich. 1997).

The Michigan courts have not yet addressed the precise question before us: whether a special relationship exists between a mold remediation contractor and the occupants of the structure that they were hired to remediate. In facing "an issue that has not yet been resolved by the Michigan courts, we must attempt to predict what the Michigan Supreme Court would do if confronted with the same question." *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007) (internal quotation marks and alteration omitted). We believe that Michigan would not recognize the existence of the "special relationship" that plaintiffs propose. First, the relationship between plaintiffs and defendants is based solely on defendants' contracts with a third party, the FAA. *Cf. Dawe*, 780 N.W.2d at 275 n.3 (noting that special relationships include "common carrier-passenger, innkeeper-guest, landlord-tenant, employer-employee, and doctor-patient relationships"). Second, plaintiffs do not claim that they somehow "entrusted" themselves to the "protection and control" of defendants such that they "lost the ability to protect" themselves. *Murdock*, 559 N.W.2d at 643. Arguably, plaintiffs entrusted themselves to the care of their employer, the FAA, and the owner of the building, but there is no averment that there was a "trust relationship" between defendants and plaintiffs. *Id.* Moreover, to hold that a "special relationship" exists in the present case would essentially render the Michigan Supreme Court's holding in *Fultz* a nullity. As the district court stated, defendants' duty to provide professional mold

remediation services was part-in-parcel to its contractual obligations to the FAA and, therefore, does not create a separate and distinct duty to plaintiffs under *Fultz*.

IV.

Finally, plaintiffs assert that the district court erred when it denied their motion for leave to file an amended complaint with respect to their proposed common law fraud claim.**17** We disagree.

We ordinarily review a district court's denial of a motion to amend a pleading for abuse of discretion. *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 604 (6th Cir. 2001). However, when "the district court denies the motion to amend on grounds that the amendment would be futile, we review denial of the motion de novo." *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

Pursuant to Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." *Id.* We interpret "Rule 9(b) as requiring plaintiffs to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Yuhasz,* 341 F.3d at 563 (citation and internal quotation marks omitted). Plaintiffs filed their proposed amended complaint ten months after their case was removed to federal district court, and thus they were required to comply with Rule 9(b).

Under Michigan law, common-law fraud requires proof that:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation

---

**17**Plaintiffs' amended complaint also asserts claims for professional negligence, intentional, reckless, and outrageous conduct, tortious interference with a contractual relationship, conspiracy to interfere with a contractual or business relationship, and negligent misrepresentation. However, because plaintiffs' initial appellate brief addressed only the district court's dismissal of their fraud claim, we need only address its decision with respect to this ruling. "[A]n appellant abandons all issues not raised and argued in its initial brief on appeal." *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006).

with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Cummins v. Robinson Twp.*, 770 N.W.2d 421, 435 (Mich. Ct. App. 2009). Further, an action for fraud must be predicated upon a false statement relating to a past or existing fact; promises regarding the future are contractual and do not support a claim for fraud. *See Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 815 (Mich. 1976). In addition, establishing a claim of fraudulent misrepresentation requires the plaintiff's reasonable reliance upon the false representation. *Cummins*, 770 N.W.2d at 435.

Plaintiffs aver that in late January to mid-March 2005, Tillotson, Safe, and Andrew Crause, a project manager for Clayton, made material misrepresentations to the FAA in their reports.[18] They allege that Tillotson, Safe, and Crause made these material misrepresentations in their effort to "bias[] the opinions of the FAA, Department of the Attorney General, Michigan OSHA, NIOSH, and an arbitrator in another legal proceeding instituted by some Plaintiffs-Controllers." Plaintiffs claim that they "relied upon said misrepresentations by continuing to work at the DTW []" to their detriment, which caused "health problems and economic loss."

Defendants argue that plaintiffs' proposed fraud claim fails as a matter of law because they did not allege that Tillotson, Safe, and Crause made the misrepresentations "with the intent or knowledge that . . . [it would be] repeated to [plaintiffs] for the purpose of deceiving [them]." *Nernberg v. Pearce*, 35 F.3d 247, 251 (6th Cir. 1994). Under Michigan law, a plaintiff must allege that the defendant's misrepresentation was made with the intent or knowledge that it would be communicated to the plaintiff with the intent to deceive him or her. *Id.*

The amended complaint does not aver that Tillotson, Safe, or Crause made the alleged misrepresentations in the FAA reports with the intent or knowledge that it would be communicated to plaintiffs with the intent to deceive them. In fact, plaintiffs simply allege that defendants made the misrepresentations "to bias[] the opinions of the FAA."

---

[18]Defendant Jacobs is mentioned only once in the amended complaint, and plaintiffs do not aver any specific wrongdoing on its part.

Rule 9(b) requires particularity because "the nature of the evidence in cases involving allegations of fraud is often circumstantial, [and] claims of fraud can be fabricated easily." *Disner v. Westinghouse Elec. Corp.*, 726 F.2d 1106, 1110 (6th Cir. 1984). Thus, fraud claims pose a higher risk that an error will be made in determining whether a defendant has committed it. *Id.*

Under *Nernberg,* we conclude that the district court properly dismissed plaintiffs' proposed fraud claim as futile under Rule 9(b). 35 F.3d at 251.

## V.

For these reasons, we affirm the district court's judgment with respect to defendants MIS, TE/OC, Safe, Jacobs, and Bureau Veritas, but reverse and remand for further proceedings consistent with this opinion with respect to defendant Coach.